**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | Civil Action No. 1:22-cv-11532-DJC |
| THE CENTRAL INTELLIGENCE AGENCY, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

In this Freedom of Information Act ("FOIA") action, Plaintiff seeks to compel the

Government to preview an undisclosed material aspect of an ongoing criminal investigation

being conducted by the Federal Bureau of Investigation ("FBI").  That investigation has

involved, *inter alia*, execution of a search warrant at the premises located at 1100 S. Ocean

Blvd., Palm Beach, Florida 33480 ("Premises"), a property of former President Donald J. Trump.

That investigation is currently being overseen by the Special Counsel appointed by the Attorney

General on November 18, 2022, and involves, *inter alia*, the potential improper removal and

storage of classified information in unauthorized spaces, as well as the potential unlawful

concealment or removal of government records.[1]  Against this backdrop, Plaintiff demands that

---

[1] *See* Appointment of John L. Smith as Special Counsel, Nov. 18, 2022, *available at* https://www.justice.gov/opa/press-release/file/1552896/download; *Donald J Trump v. United States*, No. 9:22-CV-81294-AMC (S.D. Fla. Aug. 30, 2022) (ECF No. 48 at 5- 13) (describing bases for search and seizure warrant executed in the case: 18 U.S.C. § 793 (Willful retention of

Defendants the Central Intelligence Agency ("CIA"), the Office of the Director of National Intelligence ("ODNI"), the United States Department of Defense ("DoD"), and the National Security Agency ("NSA")  produce what Plaintiff terms the "Alleged Declassification Standing Order," a "standing order that documents removed from the Oval Office and taken to the residence were deemed to be declassified the moment [then-President Trump] removed them." Compl., ECF No. 1, ¶¶ 27, 36.

It is well established that "[i]n certain cases, merely acknowledging the existence of responsive records would itself cause harm cognizable under a FOIA exception." *People for the Ethical Treatment of Animals v. Nat'l Institutes of Health, Dep't of Health & Human Servs.*, 745 F.3d 535, 540 (D.C. Cir. 2014) (internal quotation and alteration omitted); *see also*, *e.g.*, *Carpenter v. U.S. Dep't of Just.*, 470 F.3d 434 (1st Cir. 2006).  The FBI, in consultation with the Special Counsel's Office, has determined that this is such a case.  Accordingly, Defendants, in coordination with the FBI, have issued "*Glomar* responses" declining to confirm or deny the existence of the requested material.[2]  The accompanying Declaration of Michael G. Seidel, Section Chief of the Record/Information Dissemination Section, Information Management Division, FBI, explains why confirming or denying the existence of responsive records reasonably could be expected to interfere with law enforcement proceedings, placing the very fact of the records' existence or non-existence within the protection of FOIA Exemption (b)(7)(A).

---

national defense information), 18 U.S.C. § 2071 (Concealment or removal of government records), and 18 U.S.C. § 1519 (Obstruction of federal investigation)).

[2] The phrase "*Glomar* response" stems from a case in which a FOIA requester sought information concerning a ship named the *Hughes Glomar Explorer*, and the CIA refused to confirm or deny its relationship with the *Glomar* vessel because to do so would compromise the national security or divulge intelligence sources and methods.  Decl. of Michael G. Seidel, ¶ 6 n. 2.

For the reasons set forth herein and in the attached declaration, the Court should grant

Defendants' motion for summary judgment and enter judgment for Defendants.

## II.      BACKGROUND

### A.  The Ongoing Investigation

Throughout 2021, the United States National Archives and Records Administration

("NARA") had ongoing communications with representatives of former President Trump in

which it sought the transfer of what it perceived were missing records from his Administration.

*See* Letter from David S. Ferriero, Archivist of the United States, to the Hon. Carolyn B.

Maloney (Feb. 18, 2022), *available at* https://www.archives.gov/files/foia/ferriero-response-to-

02.09.2022-maloney-letter.02.18.2022.pdf ("Ferriero Letter") at 1; Letter from Debra Steidel

Wall, Acting Archivist of the United States, to Evan Corcoran (May 10, 2022), *available at*

https://www.archives.gov/files/foia/wall-letter-to-evan-corcoran-re-trump-boxes-05.10.2022.pdf

("Wall Letter") at 1.  These communications ultimately resulted in the provision of fifteen boxes

(the "Fifteen Boxes") from former President Trump to NARA in January 2022.  *See* Ferriero

Letter at 1; Wall Letter at 1; *see also In Re Sealed Search Warrant*, Case No. 22-MJ-8332 (S.D.

Fla.) ("MJ Docket"), Affidavit in Support of an Application under Rule 41 for a Warrant to

Search and Seize, ECF No. 102-1 at ¶¶ 39, 47.  When producing the Fifteen Boxes, former

President Trump never claimed that any of the documents in the boxes containing classification

markings had been declassified.  *Trump v. United States*, No. 9:22-CV-81294-AMC, ECF No. 48

at 4.

"In its initial review of materials within those boxes, NARA identified items marked as

classified national security information, up to the level of Top Secret and including Sensitive

Compartmented Information and Special Access Program materials.  NARA informed the

Department of Justice about that discovery."  Wall Letter at 1.  Specifically, on February 9,

2022, the Special Agent in Charge of NARA's Office of the Inspector General sent a referral via

email to the Department of Justice ("DOJ") (hereinafter, the "NARA Referral").  Affidavit in

Support of an Application, MJ Docket ECF No. 102-1 at ¶ 24.  The NARA Referral stated that a

preliminary review of the Fifteen Boxes indicated that they contained "newspapers, magazines,

printed news articles, photos, miscellaneous print-outs, notes, presidential correspondence,

personal and post-presidential records, and a lot of classified records.  Of most significant

concern was that highly classified records were unfoldered, intermixed with other records, and

otherwise [im]properly identified."  *Id.* (internal quotations omitted).

Between May 16–18, 2022, FBI agents conducted a preliminary review of the documents

and identified documents with classification markings in fourteen of the Fifteen Boxes.

Affidavit in Support of an Application Under Rule 41, MJ Docket, ECF No. 102-1 at ¶ 47.  A

preliminary review revealed the following:  184 unique documents bearing classification

markings:  67 documents marked as CONFIDENTIAL, 92 documents marked as SECRET, and

25 documents marked as TOP SECRET.  *Id.*  Further, the FBI agents observed markings

reflecting that the documents were subject to sensitive compartments and dissemination controls

used to restrict access to material in the interest of national security.  *Id.*

Through its investigation, the FBI developed evidence indicating that even after the

Fifteen Boxes were provided to NARA, dozens of additional boxes remained at the Premises that

were also likely to contain classified information.  *See* United States' Response to Motion for

Judicial Oversight and Additional Relief, *Trump v. United States*, 22-cv-81294 (S.D. Fl.), ECF

No. 48 ("Resp. to Mot. for Judicial Oversight") at 7.  Accordingly, DOJ obtained a grand jury

subpoena,[3] for which the former President's counsel accepted service on May 11, 2022.  *See*

Grand Jury Subpoena, Attachment C to United States' Response to Motion for Judicial Oversight

and Additional Relief, *Trump v. United States*, 22-cv-81294 (S.D. Fl.), ECF No. 48-1.  The

subpoena was directed to the custodian of records for the Office of Donald J. Trump, and it

requested "[a]ny and all documents or writings in the custody or control of Donald J. Trump

and/or the Office of Donald J. Trump bearing classification markings [list of classification

markings]."  *Id.*  DOJ also sent the former President's counsel a letter that suggested they could

comply by "providing any responsive documents to the FBI at the place of their location" and by

providing from the custodian a "sworn certification that the documents represent all responsive

records."  *See* Letter to E. Corcoran, Attachment D to United States' Response to Motion for

Judicial Oversight and Additional Relief, *Trump v. United States*, 22-cv-81294 (S.D. Fl.), ECF

No. 48-1.  The letter further stated that if no responsive documents existed, the custodian should

provide a sworn certification to that effect.  *Id.*

On June 3, 2022, three FBI agents and a DOJ attorney arrived at the Premises to receive

responsive documents from the former President's counsel and from a custodian of records for

the Office of Donald J. Trump.  *See* Resp. to Mot. for Judicial Oversight at 8.  When producing

the documents, neither counsel nor the custodian asserted that former President Trump had

declassified the documents.  *Trump v. United States*, ECF No. 48 at 8.  Once in a secure

government setting, the FBI conducted a preliminary review of the documents that counsel and

---

[3] The former President disclosed this subpoena and a subpoena for video footage at the
Premises in his submissions in *Trump v. United States*.  *See, e.g.*, *Trump v. United States*, 22-cv-
81294 (S.D. Fl.), ECF No. 1 at 5–6.  Thereafter, on August 29, 2022, Chief Judge Howell in the
District of Columbia authorized the government to disclose, in public filings in a related matter
in the Southern District of Florida, these grand jury subpoenas and material discussed herein.

the custodian of records had produced.  *See id.* at 10.  That preliminary document review

revealed the following:  38 unique documents bearing classification markings, including 5

documents marked as CONFIDENTIAL, 16 documents marked as SECRET, and 17 documents

marked as TOP SECRET.  *See id.*  Further, the FBI agents observed markings reflecting

sensitive compartments and dissemination controls.  *See id.*  Counsel for the former President

offered no explanation as to why boxes of government records, including 38 documents with

classification markings, remained at the Premises nearly five months after the production of the

Fifteen Boxes and nearly one-and-a-half years after the end of the Administration.  *See id.*

Through further investigation, the FBI uncovered multiple sources of evidence indicating

that the response to the May 11 grand jury subpoena was incomplete and that classified

documents remained at the Premises.  *See id.*  Against that backdrop, and relying on the probable

cause that the investigation had developed at that time, on August 5, 2022, the government

applied for a search and seizure warrant, which cited three statutes: 18 U.S.C. § 793 (Willful

retention of national defense information), 18 U.S.C. § 2071 (Concealment or removal of

government records), and 18 U.S.C. § 1519 (Obstruction of federal investigation).  *See* MJ

Docket, ECF No. 17 at 3.  The court found that probable cause existed that evidence of each of

the crimes would be found at the Premises, and authorized the search warrant.  *Id.* at 2.

Pursuant to the search warrant, the government was permitted to search certain specified

locations at the Premises and to seize any evidence of the applicable crimes.  MJ Docket, ECF

No. 17 at 2–4.  The government was authorized by the warrant to seize "[a]ny physical

documents with classification markings, along with any containers/boxes (including any other

contents) in which such documents are located, as well as any other containers/boxes that are

collectively stored or found together with the aforementioned documents and containers/boxes"

and any government or Presidential records created during the former President's

Administration.  *Id.* at 4.

      During the August 8 execution of the search warrant at the Premises, the Government

seized thirty-three boxes, containers, or items of evidence, which contained over a hundred

classified records, including information classified at the highest levels.  *See* Resp. to Mot. for

Judicial Oversight at 12.  Certain of the documents had colored cover sheets indicating their

classification status.  *See id.* at 13.  The classification levels ranged from CONFIDENTIAL to

TOP SECRET information, and certain documents included additional sensitive compartments

that signify very limited distribution.  *See id.*  In some instances, even the FBI

counterintelligence personnel and DOJ attorneys conducting the review required additional

clearances before they were permitted to review certain documents.  *See id.*

      The above-discussed investigation is continuing, *see* Seidel Decl. ¶ 5, and, on November

18, 2022, the Attorney General announced the appointment of a Special Counsel to oversee the

investigation.  *See* Dep't of Justice Office of Public Affairs, Appointment of a Special Counsel

(Nov. 18, 2022), *available at* https://www.justice.gov/opa/pr/appointment-special-counsel-0.

The Attorney General noted the particular sensitivity of the investigation, explaining he had

concluded that it was in the public interest to appoint a special counsel based on recent

developments, including the former President's announcement that he is a candidate for

President in the next election, and the sitting President's stated intention to be a candidate as

well.  *See id.*

### B.  Plaintiff's FOIA Requests

      As noted above, in the Complaint, Plaintiff discussed statements reportedly made by

former President Trump concerning "a standing order that documents removed from the Oval

Office and taken to the residence were deemed to be declassified the moment he removed them" (the "Alleged Declassification Standing Order").  Compl., ECF No. 1, ¶ 27; *see also id.* ¶¶ 27–28.  It is that Alleged Declassification Standing Order that is the focus of Plaintiff's FOIA requests at issue in this matter.

Specifically, on August 15, 2022, Plaintiff submitted FOIA requests to Defendants seeking:

1.  The Alleged Declassification Standing Order.

2.  Any written transmittal of the Alleged Declassification Standing Order from the Executive Office of the President of the United States to [CIA, ODNI, DoD, NSA], including by letter, memoranda, or email.

3.  All records created by [CIA, ODNI, DoD, NSA] that were declassified pursuant to the Alleged Declassification Standing Order.

*See* Seidel Decl., ¶ 3.  The first part of Plaintiff's requests directly calls for the production of the "Alleged Declassification Standing Order," while a substantive response to parts two or three likewise would require the Government to confirm or deny the existence of the "Alleged Declassification Standing Order" by confirming or denying that such an order was transmitted or that records were declassified pursuant to such an order.  Plaintiff also supplied an introductory explanation alongside the requests, discussing the August 8, 2022 search of the Premises by law enforcement officials, and noting that "[a]ccording to court documents, the August 8, 2022 search of Mar-a-Lago resulted in the seizure of classified records."  *Id.*  Plaintiff contends that "[t]he requested records (or a response that no such records exist) would meaningfully inform the public as to the truthfulness or falsity of Mr. Trump's public explanation for the apparent seizure of numerous highly classified records from that location."  Plaintiff's FOIA Request, ECF No. 9-1 at 1.

Defendants each sent Plaintiff a letter acknowledging receipt of Plaintiff's FOIA request and informing Plaintiff of the tracking number assigned to the request.  *See* Compl., ¶¶ 40–43; Answer, ¶¶ 40–43.  When Plaintiff initiated this action on September 19, 2022, *see* ECF No. 1, none of the Defendants had issued its final response.

Each of Defendants has now provided Plaintiff a final response, in which that Defendant, pursuant to FOIA Exemption (b)(7)(A), neither confirmed nor denied the existence of records responsive to Plaintiff's request.  *See* Seidel Decl., ¶ 6.  Each Defendant explained that this determination was made in coordination with the FBI, and that confirmation that Defendants have or do not have responsive records would be tantamount to acknowledging the existence or nonexistence of aspects of an ongoing investigation that the FBI has not previously acknowledged.  *See id.*  They further explained that the FBI had advised:
1) if the requested records exist, they would be relevant to the FBI's ongoing investigation and
2) confirmation as to the existence or nonexistence of such records could reasonably be expected to interfere with the ongoing investigation.  *See id.*  The Seidel Declaration discusses further why Exemption (b)(7)(A) supports the Defendants' *Glomar* responses to Plaintiff's requests in this case.

## III.     DISCUSSION

### A.  FOIA Statutory Background and Standard of Review

The Freedom of Information Act was enacted to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted); *see also Carpenter*, 470 F.3d at 437.  "Congress recognized," however, "that public disclosure is not always in the public interest," *CIA v. Sims*, 471 U.S. 159, 166-67 (1985), and "that legitimate governmental and private interests could be harmed by

release of certain types of information." *FBI v. Abramson*, 456 U.S. 615, 621 (1982); *see also Reilly v. U.S. E.P.A.*, 429 F. Supp. 2d 335, 341 (D. Mass. 2006) ("It is also necessary for the very operation of our Government to allow it to keep confidential certain material, such as the investigatory files of the Federal Bureau of Investigation.") (quoting *EPA v. Mink,* 410 U.S. 73, 80 (1973) (quoting S.Rep.No.813, 89th Cong., 1st Sess., 5, p. 3 (1965)). Thus, "Congress provided a number of exemptions that permit an agency to withhold certain documents from release." *Stalcup v. C.I.A.*, 768 F.3d 65, 69 (1st Cir. 2014); *see* 5 U.S.C. §§ 552(a)(3), (b)(1)–(9). While those exemptions are construed "narrowly," *Stalcup*, 768 F.3d at 69, the Supreme Court has recognized that they are intended to have "meaningful reach and application." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989). An agency may withhold information under a FOIA exemption only if it "reasonably foresees that disclosure would harm an interest protected by an exemption" or if "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i).

As this Court recently noted, although the Government "bears the burden of proving that any claimed exemption applies," *Moradi v. Morgan*, 527 F. Supp. 3d 144, 154 (D. Mass. 2021) (quoting *Johnson v. Cent. Intelligence Agency*, 330 F. Supp. 3d 628, 644 (D. Mass. 2018)), this burden is "a light one," as "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Id.* at 155 *(quoting Katsiaficas v. CIA*, 2017 WL 2172437, at *5 (D. Mass. May 17, 2017) (internal quotation omitted)).

"FOIA cases are typically decided on motions for summary judgment." *Id.* (quotation omitted). Summary judgment in FOIA cases "may be granted solely on the basis of agency affidavits," *id.* at 154 (quotation omitted), and as with non-FOIA cases, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Stalcup*, 768 F.3d at 69.

**B. Defendants' *Glomar* Responses Properly Protect Information Exempt from Disclosure Under Exemption (b)(7)(A).**

As the Court of Appeals explained in *Carpenter*, a "*Glomar* response" occurs when the Government responds to a FOIA request "by declining to either confirm or deny the existence of the requested materials." *Carpenter*, 470 F.3d at 436; *see also* 470 F.3d at 436 n.3 *and supra* n.1 (discussing the history of the phrase "*Glomar* response"). Such responses are proper when confirming or denying the existence of a responsive record, in itself, would reveal information protected by a FOIA exemption. "In determining whether the existence of agency records *vel non* fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).[4] That is, the government's *Glomar* assertion should be upheld if it is logical or plausible. *See Moradi*, 527 F. Supp. 3d at 155.

Here, the government has asserted that the existence or nonexistence of the Alleged Declassification Standing Order is itself protected from disclosure by Exemption (b)(7)(A). Exemption (b)(7) protects from disclosure "records or information compiled for law enforcement purposes" when production of the records or information "could reasonably be expected to cause one of six enumerated harms." *Abdul-Alim v. Wray*, 277 F. Supp. 3d. 199, 213 (D. Mass. 2017). The first of those harms is embodied in Exemption (b)(7)(A), which protects records compiled for law enforcement purposes if disclosure of those records "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). Exemption (b)(7)(A) is intended to "'prevent disclosures which might prematurely reveal the government's cases in

---

[4] The First Circuit, like other courts, has looked to FOIA decisions from the D.C. Circuit because of its "considerable experience on FOIA matters." *Main Street Legal Servs., Inc. v. Nat'l Sec. Council*, 962 F.Supp.2d 472, 474 (E.D.N.Y. Aug. 7, 2013). *See, e.g.*, *Carpenter*, 470 F.3d at 439; *Providence J. Co. v. U.S. Dep't of Army*, 981 F.2d 552, 557–62 (1st Cir. 1992).

courts, its evidence and strategies, or the nature, scope, and focus of investigations.'" *Agrama v. Internal Revenue Serv.*, 282 F. Supp. 3d 264, 273 (D.D.C. 2017), *aff'd*, 2019 WL 2064505 (D.C. Cir. Apr. 19, 2019), (quoting *Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 762 (D.C. Cir. 2000)).

As a threshold matter, "[b]efore an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes." *Id.* To satisfy Exemption (b)(7)'s "law enforcement purpose" requirement, the Government need only establish "rational nexus" between the "activities being investigated and violations of federal law" and the requested records. *See Carpenter*, 470 F.3d at 438 n.7*(*quoting *Irons v. Bell,* 596 F.2d 468, 472 (1st Cir.1979)); *see also*, *e.g.*, *ACLU of N. Cal. v. FBI*, 881 F.3d 776, 778 (9th Cir. 2018) ("an agency which has a clear law enforcement mandate, such as the FBI, need only establish a 'rational nexus' between enforcement of a federal law and the document for which an exemption is claimed . . . or a 'rational nexus' between the agency's law enforcement duties and such documents.").

Information not initially created or compiled for law enforcement purposes nonetheless fulfills Exemption (b)(7)'s threshold requirement if it is subsequently compiled for a valid law enforcement purpose at any time prior to "when the Government invokes the Exemption." *John Doe Agency*, 493 U.S. at 153–55. In *John Doe Agency*, the Supreme Court rejected a distinction drawn by the Second Circuit "between documents that originally were assembled for law enforcement purposes and those that were not so originally assembled but were gathered later for such purposes," reasoning that "[t]he plain language of Exemption 7 does not permit such a distinction." *Id.* at 155; *see also*, *e.g. Elec. Priv. Info. Ctr. v. DHS*, 777 F.3d 518, 522 (D.C. Cir.

2015) (noting that "Exemption 7 requires that a document be created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption").

In this case, the FBI, a law enforcement agency, has an active criminal investigation concerning the potential improper removal and storage of classified information in unauthorized spaces, as well as the potential unlawful concealment or removal of government records.  Seidel Decl., ¶ 5; *see also id.* ¶¶ 10, 12, 15–16.  As Mr. Seidel explains, assuming the existence of the records requested by Plaintiff, such records would be part of this investigation, and therefore would be compiled for law enforcement purposes.  *See id.*, ¶ 12.  The existence or non-existence of the "Alleged Declassification Standing Order," would bear, for example, on whether records with apparent classification markings, *see supra*, were in fact classified.  *See Trump v. United States*, 2022 WL 4366684, at *8 (11th Cir. Sept. 21, 2022) ("Plaintiff suggests that he may have declassified these documents when he was President. But the record contains no evidence that any of these records were declassified.").  Thus, the existence or non-existence of the "Alleged Declassification Standing Order" has a clear rational nexus with this investigation.  Indeed, Plaintiff appears to acknowledge that nexus in the very text of its requests, and again in the Complaint, introducing its requests by referencing the August 8, 2022, execution of a search warrant and asserting that "[t]here is reason to believe that the Alleged Declassification Standing Order is simply a lie intended to obscure Mr. Trump's crimes . . .".  Compl., ¶ 33.  Plaintiff's framing of its own requests—and explanation of those requests in the Complaint—places beyond dispute the nexus of those requests with the ongoing law enforcement investigation.

Once an agency satisfies Exemption (b)(7)'s threshold requirement by demonstrating that the records or information at issue were compiled for law enforcement purposes, the agency must show that releasing the records or information could reasonably lead to one or more of the

harms identified in subsections (b)(7)(A)–(F).  If disclosure of the very existence or non-existence of a requested record could reasonably be expected to interfere with enforcement proceedings, the agency may assert a *Glomar* response based on Exemption (b)(7)(A), as Defendants did here.  *See*, *e.g.*, *Eddington v. U.S. Dep't of Justice*, 581 F. Supp. 3d 218, 234–35 (D.D.C. 2022) (holding DOJ's *Glomar* response was justified under Exemption 7(A)); *Buzzfeed Inc. v. Dep't of Justice*, 344 F. Supp. 3d 396 (2018) (holding FBI's *Glomar* response was justified under Exemption 7(A)); *Leopold v. Dep't of Justice*, 301 F. Supp. 3d 13, 29 (D.D.C. 2018) (same).

For example, in *James Madison Project v. Dep't of Justice*, the court concluded that the government's *Glomar* response to the plaintiffs' FOIA request was proper under Exemption (b)(7)(A).  *See James Madison Project v. Dep't of Justice*, 330 F. Supp. 3d 192, 203 (D.D.C. 2018).  The requestors in that case sought "records related to the question of 'whether President Donald J. Trump is or ever was a target of, subject of, or material witness to any investigation.'" *Id.* at 199 (quoting complaint).  The FBI explained that a *Glomar* response was necessary because "official confirmation of who is or who is not considered a subject or witness in an investigation would also alert others – including other potential subjects and witnesses – about the focus and scope of the investigation, which could influence their behavior and testimony in ways that adversely affects the investigation."  *Id.* at 203 (quoting FBI declaration).  Responding that there were or were not responsive records would allow potential subjects and witnesses "to alter or offensively structure their testimony, and also to take defensive actions to conceal their activities, elude detection, and destroy, adulterate, or fabricate evidence."  *Id.*  On these facts, the court held that the FBI had supplied sufficient information to support its *Glomar* response under Exemption (b)(7)(A) because "merely revealing whether or not responsive records exist would

give rise to a risk of interference with law enforcement proceedings that are pending or reasonably anticipated."

Additionally, although it did not address a *Glomar* response, the court's application of Exemption (b)(7)(A) in *Dow Jones & Co. v. U.S. Dep't of Justice* is instructive here. *See Dow Jones & Co. v. U.S. Dep't of Just.*, 880 F. Supp. 145 (S.D.N.Y. 1995) (Sotomayor, J.), *opinion vacated in part on other grounds*, 907 F. Supp. 79 (S.D.N.Y. 1995). *Dow Jones* involved an investigation into the death of former deputy White House Counsel Vincent W. Foster, and a photocopy of a torn-up note, apparently written by him, which was found in his briefcase several days after his death. *Id.* at 147. The FBI and Park Police conducted investigations and completed reports of their investigations. *Id.* The Attorney General subsequently appointed an independent counsel, and that independent counsel's investigation developed to include inquiry into the circumstances surrounding Vincent Foster's death and events occurring in the White House following his death, including the discovery and handling of the note. *Id.* at 147–48.

The plaintiffs in *Dow Jones* sought the FBI and Park Police reports under FOIA. However, the independent counsel assessed that public disclosure of the reports would substantially prejudice his investigation and asserted that the reports were therefore protected from disclosure under Exemption (b)(7)(A). The court agreed. In particular, the court found persuasive the independent counsel's judgment that "public disclosure of information found in the Reports, such as statements by interviewees and the facts gathered and the conclusions reached as to certain matters, might affect the testimony or statements of other witnesses and could severely hamper the Independent Counsel's ability to elicit untainted testimony." *Id.* at

148.[5]  That is, the court agreed that disclosure of evidence pertaining to an ongoing investigation reasonably could be expected to interfere with that investigation.

So, too, in this case.  While the FBI's investigation in this case has been officially acknowledged, the existence or non-existence of the Alleged Declassification Standing Order, or whether Defendants currently have such an order, has not been officially acknowledged, and nor has any evidence the investigation has developed with regard to the existence or non-existence of the Alleged Declassification Standing Order.  Seidel Decl. ¶ 15.  As Mr. Seidel explains in his declaration, confirmation or denial of whether each of the Defendant agencies currently has the Alleged Declassification Standing Order (or has documents that establish its existence), would disclose facts gathered during the course of the pending investigation that might lead persons of interest to alter their testimony; destroy, adulterate, or fabricate evidence; or refuse to cooperate with the Government altogether.  *See id.* ¶ 16.  As noted above, the existence or non-existence of the Alleged Declassification Standing Order would bear on whether records with apparent classification markings were in fact classified, an obviously important issue in an investigation about the potential improper removal and storage of classified information.

Publicly disclosing whether or not Defendants have the Alleged Declassification Standing Order could reasonably alter how persons of interest to the investigation interact with the investigation – *e.g.*, whether and when they decide to cooperate, or what information they decide to provide – and could influence their testimony.  *See id.*  It would clearly be a disclosure

---

[5] The independent counsel later determined that part of the Park Police report could be disclosed without prejudicing the investigation, but the court held that that disclosure did not affect the applicability of Exemption (b)(7)(A) to the balance of the information in that report and in the FBI report.  *See Dow Jones & Co.*, 880 F. Supp. at 150.  "Questions about the continued applicability of Exemption 7(A) were resolved" by declaration from a different, subsequently-appointed independent counsel stating that the parts of the report that had not been disclosed continued to be central to his ongoing investigation.  *Id.*

that would "prematurely reveal the government's . . . evidence" and is thus protected by Exemption (b)(7).  *Agrama*, 282 F. Supp. 3d at 273; *see also Dow Jones*, 880 F. Supp. at 149–50. Any testimony gathered after the disclosure could thus be tainted, since each person the FBI interviewed thereafter would have the opportunity to mold his or her statements in light of the prematurely-disclosed evidence.  Seidel Decl. ¶ 16.  More than that—regardless of whether any responsive records exist—confirmation or denial of the fact of their existence, like in *James Madison Project*, would provide those intent on interfering with the investigation additional pieces of information necessary to target their behaviors to maximize the effect of any efforts to undermine the investigation.  *See id.*  This, in turn, reasonably could be expected to severely hamper the FBI's ability to ascertain the truth and, assuming there was a violation of the law, for the matter to be successfully prosecuted.  *Id.*

* * * * * * *

Thus, for all the reasons explained herein, the *Glomar* responses issued by the CIA, ODNI, DoD, and NSA to Plaintiff's requests, in coordination with the FBI, are justified under Exemption (b)(7)(A).  Additionally, for all the reasons stated above, the FBI reasonably foresees that disclosing whether or not the Alleged Declassification Standing Order exists (and whether or not Defendants have it) would harm the interests protected by Exemption (b)(7)(A).

## IV.    CONCLUSION

For all of these reasons, the Court should grant Defendants' motion for summary judgment and enter judgment for Defendants.

Dated: February 6, 2023                 Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

*/s/ Julia A. Heiman*
JULIA A. HEIMAN (D.C. Bar No. 986228)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Tel: 202-616-8480
julia.heiman@usdoj.gov