**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMERICAN CIVIL LIBERTIES UNION OF
MASSACHUSETTS, INC.,

                    Plaintiff,

    v.

THE CENTRAL INTELLIGENCE AGENCY,
THE OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE, THE UNITED
STATES DEPARTMENT OF DEFENSE, and
THE NATIONAL SECURITY AGENCY,

                    Defendants.

Civil Action No. 22-CV-11532-DJC

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLANTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Declassification orders are public documents.  They exist to make things less secret, not more.  There is no contention in this case that the Alleged Declassification Standing Order, if it existed, was secret when issued or was conceivably subject to any exemption from the Freedom of Information Act at any time during the Trump Administration.

Nevertheless, Defendants in this case argue that, even if the alleged order was a public document when issued, and even if it resides with the defendant agencies, the order can now be erased from the public record—not only its content, but the fact of its very existence or nonexistence—merely because years later the FBI took an interest in it.  That is not the law. ACLUM is not seeking any information about the FBI's investigative activities, nor any materials compiled in the FBI's files of any investigation.  ACLUM is not seeking any of the FBI's witness interviews, nor any grand jury testimony, nor records collected by the FBI or DOJ pursuant to a grand jury subpoena or search warrant.  ACLUM is not seeking anything from the FBI or DOJ at all.

There are no doubt thousands of public documents in the possession of dozens of government agencies—or even in the Federal Record or other government publications—that have some relevance to ongoing FBI investigations.  The FBI is effectively seeking judicial permission to retroactively pull these public documents from circulation—and erase the knowledge of their very existence or nonexistence from the public domain—based on the FBI's unilateral decision to open an investigation of potentially indefinite duration.  FOIA does not contemplate this power grab, and Defendants have not cited any case where a judge has endorsed it.  Defendants' motion should be denied.

To be clear, denying Defendants' current motion does not mean that ACLUM necessarily gets the responsive records in their entirety or even at all.  Defendants would be free to assert any applicable FOIA exemptions over any responsive materials, subject to further litigation if ACLUM disagreed with the basis for such assertions.  But, at a minimum, Defendants should be required to state whether or not they have searched for and located any responsive documents, and whether any such documents are being withheld.  There is a strong public interest in the release of at least that information.

Accordingly, ACLUM respectfully requests that the Court deny Defendants' Motion for Summary Judgment and grant ACLUM's Cross-Motion.

## BACKGROUND

**A.      The Alleged Declassification Standing Order**

More than a year after the end of the Trump Administration, the FBI searched former President Donald J. Trump's residence and club known as "Mar-a-Lago" and seized numerous records bearing classification markings.[1]  Plaintiff's Response to Defendants' Statement of Facts

---

[1] The FBI conducted this search pursuant to a search warrant issued by the United States District Court for the Southern District of Florida on August 5, 2022, based upon an affidavit submitted by a Special Agent of the FBI.

and Statement of Additional Facts ("PSOF") ¶ 3.  Shortly thereafter, Mr. Trump issued a statement asserting that while President he "often took documents, including classified documents, to the residence" and "had a standing order that documents removed from the Oval Office and taken to the residence were deemed to be declassified the moment he removed them."  PSOF ¶¶ 35-36. This statement was read aloud on a Fox News cable television segment by John Solomon, who Mr. Trump had previously designated as one of his representatives for access to Presidential records of his administration pursuant to the Presidential Records Act, 44 U.S.C. §§ 2201–07 and 36 C.F.R. § 1270.44(a)(4).  PSOF ¶¶ 34-35.  Mr. Trump repeated these claims on social media, stating, "Number one, it was all declassified"—"it" evidently referring to the documents seized from Mar-a-Lago—and "Lucky I Declassified!"  PSOF ¶ 37.  More than a dozen former senior Trump administration officials, including former National Security Advisor John Bolton,[2] former United States Attorney General William Barr,[3] and former White House Chiefs of Staff John

*See* Affidavit in Support of an Application under Rule 41 for a Warrant to Search and Seize, *In re Sealed Search Warrant*, No. 22-MJ-8332 (S.D. Fla.), ECF. No. 102-1 (attached as Exhibit 1 to Plaintiff's Response to Defendants' Statement of Facts and Statement of Additional Facts).

[2] Bolton stated that the Alleged Declassification Standing Order is "almost certainly a lie."  Z. Kanno-Youngs and M. Haberman, *Trump's Shifting Explanations Follow a Familiar Playbook*, N.Y. Times (Aug. 14, 2022), https://www.nytimes.com/2022/08/14/us/politics/trump-documents-explanations.html.  He further stated that "[he] was never briefed on any such order, procedure, policy when [he] came in," and added that "[if Mr. Trump] were to say something like that, you would have to memorialize that, so that people would know [the Alleged Declassification Standing Order] existed."  *Id.*

[3] Barr stated, "I can't think of a legitimate reason why they should have been—could be taken out of government, away from the government if they are classified," and "I, frankly, am skeptical of the claim that [Trump] declassified everything."  M. Coggins, *Bill Barr slams Trump's special master request as 'red herring' as legal battle with DOJ continues*, Fox News (Sep. 2, 2022 3:01 PM), https://www.foxnews.com/media/bill-barr-slams-trumps-special-master-request-red-herring-legal-battle-doj-continues.

Kelly[4] and Mick Mulvaney,[5] quickly came forward to deny the existence of the Alleged Declassification Standing Order.  PSOF ¶ 38.

Declassification orders do exist, and those that exist are not secret.  For example, on September 3, 2021, President Joe Biden issued a public Executive Order regarding the declassification of certain documents concerning the terrorist attacks of September 11, 2001. PSOF ¶ 21.  On January 19, 2021, then-President Trump issued a public memorandum declassifying documents related to an FBI investigation.  PSOF ¶ 22.  In 2013, defendant ODNI publicly announced the declassification of information pertaining to the so-called Terrorist Surveillance Program active during former President George W. Bush's administration.  PSOF ¶ 23.  In 1994, then-President Clinton issued a public bulk declassification order for records from World War II and the Vietnam War.  PSOF ¶ 24. And former Presidents Barack Obama, George W. Bush, and Bill Clinton all issued public standing orders for declassification, in the form of an automatic declassification process built into their orders regulating national security information. PSOF ¶ 25.  Thus, to the extent that former President Trump issued the Alleged Declassification Standing Order, there would have been nothing inherently secret about it.  PSOF ¶ 28.  And Defendants have offered no evidence to the contrary.  PSOF ¶ 27.  Nor have they offered any evidence that any such order had any relationship to any criminal investigation—indeed that would appear to be chronologically impossible because the FBI's current investigation started long after

---

[4] Kelly stated that "[n]othing approaching an order that foolish was ever given," and that "[he] can't imagine anyone that worked at the White House after me that would have simply shrugged their shoulders and allowed that order to go forward without dying in the ditch trying to stop it."  J. Gangel, E. Stuart, & J. Herb, *CNN Exclusive: 'Ludicrous.' 'Ridiculous.' 'A complete fiction.': Former Trump officials say his claim of 'standing order' to declassify is nonsense*, CNN (Aug. 18, 2022 10:27 PM), https://www.cnn.com/2022/08/18/politics/trump-claim-standing-order-declassify-nonsense-patently-false-former-officials/index.html.

[5] Mulvaney stated that he was "not aware of a general standing order."  *Id.*

the latest date that former President Trump could possibly have issued any declassification order (*i.e.*, the end of his presidency).  PSOF ¶¶ 26, 33.

There is strong public interest in the immediate disclosure of whether the Alleged Declassification Standing Order exists.  First, the public should know whether former President Trump declassified materials based solely on their physical movement within the White House, or is lying in claiming that he did.  Second, if the Alleged Declassification Standing Order actually exists, it has been a public document since its issuance, and the government should not be permitted to retroactively make it secret—and wipe the very fact of its existence from the public record— merely because the FBI later made the unilateral decision to open an investigation of indefinite duration.  PSOF ¶¶ 26-28, 33.

**B.     ACLUM's FOIA Requests**

On August 15 and 16, 2022, ACLUM submitted FOIA requests to agencies including the Office of the Director of National Intelligence ("ODNI"), the Department of Defense ("DoD"), the Central Intelligence Agency ("CIA"), the National Security Administration ("NSA"), the Department of Homeland Security ("DHS"), and the National Geospatial-Intelligence Agency ("NGA"), among others, seeking: (1) the Alleged Declassification Standing Order; (2) any written transmittal of the Alleged Declassification Standing Order from the Executive Office of the President of the United States to the recipient department/agency, including by letter, memoranda, or email; and (3) all records created by the recipient department/agency that were declassified pursuant to the Alleged Declassification Standing Order.  PSOF ¶¶ 1, 16.

The DHS and NGA responded to ACLUM's FOIA requests stating that each had performed a full review and could not find any responsive documents.  PSOF ¶¶ 17-18.  The CIA,

ODNI, DoD, and NSA did not respond to ACLUM's FOIA requests within the statutory timeframe.  PSOF ¶ 20.

## C.    Procedural History

On September 19, 2022, ACLUM filed a complaint against the CIA, ODNI, DoD, and NSA asserting that they failed to produce records responsive to its requests.  D.E. 1.  Defendants have moved for summary judgment.  Defendants' sole argument is that they are not required to confirm or deny the existence of any responsive records—a so-called "*Glomar*" response—because the FBI (which is not a party) has told them not to.  *See* D.E. 24.

## LEGAL STANDARDS

The Freedom of Information Act mandates "broad disclosure of Government records" to the public.  *CIA v. Sims*, 471 U.S. 159, 166 (1985).  Under FOIA, the government bears the burden of justifying the withholding of responsive records, and the court reviews the legality of any withholdings *de novo*. 5 U.S.C. § 552(a)(4)(B).  FOIA creates "a strong presumption in favor of disclosure," *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 236 (1978), and though it provides for narrow categories of exempted records, those "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act," *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).  As a result, courts "construe [exemptions] narrowly, with any doubts resolved in favor of disclosure."  *Carpenter v. Dep't of Justice*, 470 F.3d 434, 438 (1st Cir. 2006) (citing *Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)).

In rare cases, an agency may refuse to confirm or deny the existence of responsive records when confirming or denying the existence of records "would itself cause harm cognizable under a FOIA exception."  *Roth v. Dep't of Justice,* 642 F.3d 1161, 1178 (D.C. Cir. 2011) (internal quotation marks and citation omitted).  The refusal to confirm or deny is known as a "*Glomar*"

response, a term derived from a ship named the *Hughes Glomar Explorer* that was "used in a classified Central Intelligence Agency project to raise a sunken Soviet submarine from the floor of the Pacific Ocean to recover the missiles, codes, and communications equipment onboard for analysis by United States military and intelligence experts." *Roth*, 642 F.3d at 1171 (internal quotation marks and citation omitted). In response to a FOIA request by a journalist for records regarding the CIA's alleged efforts to convince news media not to publish stories about its secret project, the CIA initially refused to either confirm or deny whether it had such records on the basis that the mere fact of the records' existence was classified and protected from disclosure. *Phillippi v. CIA*, 546 F.2d 1009, 1011-12 (D.C. Cir. 1976). As further explained below, courts have subsequently upheld *Glomar* responses in narrow categories of cases, including (1) those where the underlying records address intelligence or military matters of extraordinary secrecy that have not been publicly acknowledged (such as whether the CIA did or did not recover secret Soviet technology during the Cold War), and (2) those where the request attempts to identify what materials have been collected in law enforcement's investigative files (usually the FBI's or DOJ's) in the midst of their active investigation. But ACLUM's request in this case does not fit in either category.

## ARGUMENT

### I.  DEFENDANTS HAVE NOT SATISFIED THEIR BURDEN TO PROVE THAT THEIR *GLOMAR* RESPONSES—WHICH ATTEMPT TO ERASE PUBLIC INFORMATION FROM THE PUBLIC RECORD—ARE LAWFUL.

Defendants have not met their burden to show that their *Glomar* responses are appropriate. *Glomar* responses are "an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request." *Roth*, 642 F.3d at 1178. Agencies can only rely on a *Glomar* response under "unusual circumstances, and only by a particularly

persuasive affidavit," *Florez v. CIA*, 829 F.3d 178, 182 (2d Cir. 2016), that "provide[s] specific, non-conclusory justifications for withholding that information," *Roth*, 642 F.3d at 1178.

The government bears the burden of demonstrating that "confirming or denying the existence of records would itself 'cause harm cognizable under a FOIA exception.'" *ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013) (quoting *Roth*, 642 F.3d at 1178). However, even if the government mounts a valid exemption claim, disclosure may still be compelled if the government has officially acknowledged the otherwise exempt information through prior disclosure. *Id.* at 426-27. Under this official acknowledgement doctrine, the plaintiff bears "the initial burden of pointing to specific information in the public domain" that is sufficient to establish "the fact of the existence (or nonexistence) of responsive records." *Id.* at 427.

Here, Defendants' *Glomar* responses fail because Defendants have failed to demonstrate that *Glomar* is applicable at all to formerly public documents; have failed to demonstrate that, even if *Glomar* is applicable, confirming or denying the existence of responsive records would cause harm under Exemption 7(A); and because, in any event, an authorized representative of former President Trump, who purportedly issued the Alleged Declassification Standing Order, has publicly asserted the existence of responsive records. Accordingly, Defendants' *Glomar* responses are unlawful, their motion for summary judgment should be denied, and ACLUM's cross-motion for summary judgment should be granted.

A.   ***Glomar* Does Not Apply Because There Was Nothing Secret About the Alleged Declassification Standing Order and Because ACLUM Is Not Seeking Any Materials or Information Compiled by or for the FBI for Its Investigation.**

As an initial matter, Defendants have not shown that there was anything inherently secret about the Alleged Declassification Standing Order (assuming it even exists). Declassification orders are necessarily documents that lift secrecy, not create it. Defendants do not appear to argue

that any FOIA exemption would have applied to the alleged order prior to the FBI's initiating its investigation after the end of the Trump Administration.  PSOF ¶¶ 27, 33.  Thus, this is not a classic *Glomar* situation where the underlying records are so inherently secret—such as records that the CIA had recovered Soviet nuclear weapons from the ocean floor—that merely confirming or denying their existence would provide secret information to an adversary.  *Cf. Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981).  This situation is the opposite: declassification orders are routinely public.  And agencies can routinely respond to requests for such records, exactly as DHS and NGA have already done here.  PSOF ¶¶ 17-18.

Nevertheless, the government appears to assert that, even if the requested records *were* of an inherently public nature at the outset, and even if they are being requested from the files of *non-law enforcement* agencies, the records could nevertheless *become* secret—so secret that their mere existence must be wiped from the public record—when, years later, the FBI unilaterally opened an investigation to which the purported declassification order might be relevant.  *See* D.E. 24-1 at 12-13.  But the law does not say that pre-existing public records held by other agencies must vanish merely because they become of interest to the FBI, and ACLUM has not sought any information from the files of the FBI itself.  *See Curran v. Dep't of Justice*, 813 F.2d 473, 475 (1st Cir. 1987).  Rather, Exemption 7(A) allows an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  Thus, the government's invocation of Exemption 7(A) is appropriate only if: (1) the information or record was compiled for law enforcement purposes; and (2) the information is reasonably likely to interfere with enforcement proceedings.  *100Reporters LLC v. Dep't of Justice*, 248 F. Supp. 3d 115, 161 (D.D.C. 2017).  Here, the government's brief and

supporting declaration do not establish either that the requested records (to the extent they exist), or information concerning their existence or nonexistence, were compiled by these Defendants for law enforcement purposes, or that confirming or denying the existence of responsive records is reasonably likely to interfere with enforcement proceedings.

"'In order to withhold documents under Exemption 7, the agency must, as a preliminary matter,' make a 'threshold' showing 'that the records were compiled for a law enforcement purpose.'" *Reporters Comm. for Freedom of the Press v. FBI*, 369 F. Supp. 3d 212, 220 (D.D.C. 2019) (quoting *Pinson v. Dep't of Justice*, 313 F. Supp. 3d 88, 113 (D.D.C. 2018)).  Where the purported law enforcement purpose is an investigation, the agency must "establish (1) 'a rational nexus between the investigation and one of *the agency's law enforcement duties*; and (2) a connection between an individual or incident and a possible security risk or violation of federal law.'" *100Reporters LLC*, 248 F. Supp. 3d at 161 (quoting *Ctr. For Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003) (emphasis added).

Defendants have not met their burden to show that they "compiled" the requested records, or any information regarding the requested records, for any purpose.  As the Supreme Court has explained, "[a] compilation, in its ordinary meaning, is something composed of materials collected and assembled from various sources or other documents." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 153 (1989).  The government offers no evidence that Defendants here—all of which are intelligence or military entities—"collect[ed] or "assemble[d]" the Alleged Declassification Standing Order.  PSOF ¶ 30.  Nor did they "collect[]" and "assemble[]" any written transmittal of the alleged order from the Executive Office of the President of the United States.  PSOF ¶ 30.  If then-President Trump actually issued a standing order to declassify records, there is no evidence that Defendants would have been anything more than passive recipients of it, years prior to the

FBI's opening its current investigation.  PSOF ¶¶ 26, 30, 33.  Yet according to the government, when one Executive agency (here, the FBI) opens a later criminal investigation, it can pull public documents held by other agencies out of the public record and refuse to tell the public whether or not those documents ever even existed.  This is not what Exemption 7(A) permits.  *See Curran*, 813 F.2d at 475 ("[M]erely because a piece of paper has wended its way into an investigative dossier created in anticipation of enforcement action, an agency – even one having a function as sensitive as the FBI – cannot automatically disdain to disclose it.").  The FBI cannot erase a public document residing in the files of *other departments or agencies* simply by making a unilateral decision to open an investigation or to collect a copy of the document for an investigation, particularly where the scope and duration of that investigation is also under the unilateral control of the FBI and DOJ.  That power could easily be abused (including by future presidential administrations), and would be antithetical to the purpose of the statute.  *See Robbins Tire*, 437 U.S. at 242 ("The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.").

    Nor have Defendants provided any suggestion—let alone evidence—that the Alleged Declassification Standing Order is connected to any law enforcement purpose of ODNI, CIA, DoD, or NSA, or that these entities have any law enforcement duties relevant to this case.  *See e.g.*, *Weissman v. CIA,* 565 F.2d 692, 696 (D.C. Cir. 1977) (holding that the CIA could not invoke Exemption 7 because it was not engaged in law enforcement activity); 50 U.S.C. § 3036(d)(1) (providing that the CIA "shall have no police, subpoena, law-enforcement powers, or internal-security functions").  The sole declaration appended to Defendants' brief comes from the Chief of the Record/Information Dissemination Section of the FBI—a stranger to this litigation—and

provides that "the FBI has an active criminal investigation," and that "in coordination with Special Counsel Smith's office," the FBI made a "determination that . . . acknowledging the existence or nonexistence of aspects of an ongoing investigation that the FBI has not previously acknowledged . . . could reasonably be expected to interfere with the [FBI's] ongoing investigation."  Seidel Decl. ¶¶ 5-7.  In other words, although the government's reliance on Exemption 7(A) appears to depend solely on the FBI's investigation and the FBI's law enforcement duties, that reliance neglects the fact that ACLUM has not asked the FBI or DOJ for any of their records, has not sought the contents of any of their investigative files, and has not named the FBI or DOJ as parties in this case.  That oversight is fatal to the government's reliance on Exemption 7(A).

In the vast majority of cases where courts have upheld the use of Exemption 7(A), it has been the defendant agency's own investigation for which the exempted records were compiled, not a third-party agency's investigation.  *See, e.g.*, *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479 (S.D.N.Y. 2010) (CIA OIG investigation); *100Reporters LLC v. Dep't of Justice*, 248 F. Supp. 3d 115 (D.D.C. 2017) (combined DOJ and SEC investigation); *Radcliffe v. IRS*, 536 F. Supp. 2d 423 (S.D.N.Y. 2008) (IRS investigation); *N.Y. Times Co. v. FBI*, 297 F. Supp. 3d 435 (S.D.N.Y. 2017) (FBI investigation).  And even in cases where multiple defendant agencies have raised the same exemption, each agency has provided its own declaration or affidavit justifying the claimed exemption.  *See Leopold v. Dep't of Justice*, 411 F. Supp. 3d 1094 (C.D. Cal. 2019) (declarations submitted for each independent agency); *Project for Priv. and Surveillance Accountability, Inc. v. Dep't of Justice*, 2022 U.S. Dist. LEXIS 170174, *38 (D.D.C. Sep. 19, 2022) (declarations submitted for each agency under the Department of Justice).

Defendants place undue reliance on *John Doe Agency v. John Doe Corp.* for the proposition that there is no line between "documents that originally were assembled for law

enforcement purposes and those that were not so originally assembled but were gathered later for such purposes." Government's Br. at 12 (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 155 (1989)). That assertion over-reads the implications of that case. The plaintiff in *John Doe Agency* had sent a FOIA request *to the FBI* seeking documents that had been transferred to the FBI's investigative file in connection with an investigation being conducted by the FBI. *Id.* at 149. By contrast, here ACLUM did not request any documents from the FBI or its investigatory file. ACLUM requested inherently public documents still resident at the CIA, ODNI, DoD, and NSA, and that necessarily pre-date the FBI's investigation. Indeed, DHS and NGA—which almost certainly would also have received the order, if it exists—did not contend that any law enforcement purpose was implicated by the order and had no trouble responding to ACLUM's request in the ordinary course. PSOF ¶¶ 17-18. And the National Reconnaissance Office ("NRO") was able to process ACLUM's request in the ordinary course and sent its final administrative response *just two weeks ago*—a response that did not claim any law enforcement concerns and did not mention *Glomar*. PSOF ¶ 19.

Defendants ask the Court to consider the FBI's law enforcement purpose because the "determination [to issue a *Glomar* response] was made in coordination with the FBI." Seidel Decl. ¶ 6. But government agencies cannot confer law enforcement purposes upon each other merely by coordinating their litigation positions. If this document exists and resides with multiple agencies, and if those agencies acquired it for reasons having nothing to do with FBI's law enforcement *investigation*, then those agencies' possession of that document has nothing to do with the FBI's law enforcement *purpose*. Defendants' position finds no support in cases they cite, the text of Exemption 7(A), or its proper scope.

**B.    The Government Has Not Shown that Disclosure of the Existence or Nonexistence of the Alleged Declassification Standing Order Is Reasonably Likely to Interfere with Enforcement Proceedings.**

The government has also failed to establish that confirming or denying the existence of the Alleged Declassification Standing Order is likely to interfere with enforcement proceedings. According to the government, confirming or denying that Defendants have the Alleged Declassification Standing Order could interfere with the FBI's investigation because it "might lead persons of interest to alter their testimony; destroy, adulterate, or fabricate evidence; or refuse to cooperate with the government altogether" and "would provide those intent on interfering with the investigation additional pieces of information necessary to target their behaviors to maximize the effect of any efforts to undermine the investigation."  Seidel Decl. ¶ 16.  These conclusory, speculative, and generalized interference concerns, parroted from the FBI's declaration in *James Madison Project v. Dep't of Justice*, 330 F. Supp. 3d 192 (D.D.C. 2018), fail for several reasons.

Unlike in *James Madison*, confirming or denying the existence of documents responsive to ACLUM's requests would not disclose anything about the FBI's investigation.  The plaintiffs in *James Madison* sought records *from the Department of Justice* concerning "whether [then] President Donald J. Trump is or ever was a target of, subject of, or material witness to any investigation"—information which the requestors conceded fell within the scope of Exemption 7(A).  *Id.* at 199.  The DOJ justified its *Glomar* response with a declaration from the FBI asserting that such response was necessary because "official confirmation of who is or is not considered a subject or witness in an investigation would also alert others—including other potential subjects and witnesses—about the focus and scope of the investigation, which could influence their behavior and testimony in ways that adversely affects the investigation."  *Id.* at 203.  Here, by contrast, disclosing whether Defendants possess the Alleged Declassification Standing Order

would not alert subjects or witnesses about the focus or scope of the FBI's investigative activities—it would not disclose anything about the FBI's investigative plans or activities at all.

The government's reliance on *Dow Jones & Co. v. U.S. Dep't of Justice,* 880 F. Supp 145 (S.D.N.Y. 1995), also fails for this reason.  The plaintiffs in *Dow Jones* sought reports prepared by the United States Park Police and the FBI in connection with their investigation into the death of former deputy White House Counsel Vincent W. Foster, which contained, *inter alia*, summaries of interviews with relevant witnesses, reports of investigative steps taken in connection with the investigation, and documents transferred into the Park Police's and the FBI's investigatory files. *Id.* at 150.  The government's declarant in the case maintained that public disclosure of information found in the reports, including "statements by interviewees and the facts gathered and the conclusions reached" in the investigation, "might affect the testimony or statements of other witnesses" and could hamper investigators' ability "to elicit untainted testimony."  *Id.* at 150. Here, ACLUM's requests do not seek investigative reports containing statements by interviewees that might reasonably affect the testimony of other witnesses.

Additionally, the FBI's claim that merely acknowledging the existence or nonexistence of records responsive to ACLUM's requests in this case could be expected to interfere with its investigation must fail where, as here, other agencies have already stated that they have no responsive records.  The government's brief wholly ignores the responses from DHS and NGA, both of which responded to ACLUM's requests by stating that "comprehensive" and "extensive" searches of their files failed to identify any responsive records.  PSOF ¶¶ 17-18.  NRO provided its substantive administrative response just two weeks ago, without invoking *Glomar*.  PSOF ¶ 19. The FBI does not claim that these responses interfered with its investigation.

15

*Reporters Comm. for Freedom of the Press v. FBI*, 369 F. Supp. 3d 212 (D.D.C. 2019), while an Exemption 7(E) case, is instructive.  The plaintiff in *Reporters Committee* sought documents from the FBI relating to its impersonation of documentary filmmakers and film crews. *Id.* at 214.  The FBI gave a *Glomar* response, refusing to confirm or deny the existence of any such records other than those relating to the investigation of cattle rancher Cliven D. Bundy and his supporters.  *Id.*  The FBI maintained that while the government had publicly revealed that it had impersonated a documentary film crew to investigate Bundy, confirming or denying the existence of other responsive records would disclose an unknown law enforcement technique that was not otherwise well-known.  *Id.* at 223.  The court rejected the FBI's argument, finding it "implausible" that revealing whether responsive documents existed would disclose an unknown law enforcement technique when the technique had already been disclosed.  *Id.*  It is similarly "implausible" for the FBI to assert here that it would interfere with its investigation for Defendants to confirm or deny the existence of responsive records when other agencies have already done so without any assertion of interference by the FBI.

Nor is the government in sole possession of knowledge about whether the Alleged Declassification Standing Order exists.  That information is also known by at least one private citizen—former President Trump—who has already asserted the order's existence on television. *Cf. Chesapeake Bay Found., Inc. v. U.S. Army Corps of Eng'rs*, 677 F. Supp. 2d 101, 108 (D.D.C. 2009) (finding defendant's Exemption 7 claims deficient where it failed to "explain how its investigation will be impaired by the release of information that the targets of the investigation *already possess*") (emphasis in original).  And, to the extent that the FBI is worried that former President Trump might attempt to influence witnesses by promoting a fictitious story about a fake declassification order, Mr. Trump has *already* proposed the existence of such an order in the most

public way possible, and in a forum where many witnesses were likely to hear it.  *See* PSOF ¶¶ 35-36.  In other words, whether Mr. Trump is telling the truth or lying, the statement has been made, and the government has not proven that responses to this particular FOIA request would have any impact on the status quo of the investigation.

## II.      THE EXISTENCE OF RESPONSIVE RECORDS HAS BEEN ACKNOWLEDGED.

The government's *Glomar* response should be rejected for the additional reason that former President Trump's records custodian John Solomon has acknowledged "the existence or nonexistence of the particular records covered by the *Glomar* response."  *ACLU v. DOD*, 322 F. Supp. 3d 464, 475 (S.D.N.Y. 2018) (quoting *Wilner v. NSA*, 592 F.3d 60, 70 (2d Cir. 2009)).  While courts outside the First Circuit have held that public statements by private citizens do not qualify as "official acknowledgements," here the disclosure comes from the statutorily-designated agent of the former President who issued the Alleged Declassification Order.  Accordingly, the "official acknowledgement" doctrine should apply, at least indirectly or by analogy.

An official acknowledgement can occur directly, when the government makes a statement admitting the existence or nonexistence of responsive records, or indirectly, "when the substance of an official statement and the context in which it is made permits the inescapable inference that the requested records in fact exist" or not.  *Id.*  The official acknowledgement need not come from a defendant agency itself—"the President, as the 'head' of the entire Executive Branch, may make official acknowledgements binding on its agencies."  *Knight First Amendment Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 815 (D.C. Cir. 2021).

When courts apply the official acknowledgment doctrine to information found in specific responsive records, they ordinarily use a three-pronged test.  *See Block & Leviton LLP v. FTC*, Civil Action No. 19-12539-PBS, 2020 U.S. Dist. LEXIS 191127, at *20 (D. Mass. Oct. 15, 2020)

("Information is 'officially acknowledged' if '(1) the information requested [is] as specific as the information previously released; (2) the information requested . . . match[es] the information previously disclosed; and (3) the information requested . . . already [has] been made public through an official and documented disclosure.'").  However, in the *Glomar* context, "if the prior disclosure establishes the *existence* of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue—the existence of records—and the specific request for that information."  *Wolf v. CIA*, 473 F.3d 370, 379 (D.C. Cir. 2007) (emphasis in original).

For example, in *ACLU v. CIA*, the CIA issued a *Glomar* response to a request for information concerning the United States' use of lethal drones to conduct targeted killings.  710 F.3d 422, 425-26 (D.C. Cir. 2013).  The D.C. Circuit rejected the response as unlawful, holding that because the then-CIA director had officially acknowledged "that the Agency does have an interest in drone strikes, it beggars belief that it does not also have documents relating to the subject."  *Id*. at 431.  Likewise, in *Wolf v. CIA*, 473 F.3d at 379, and *Boyd v. Criminal Division of Dep't of Justice*, 475 F.3d 381, 389 (D.C. Cir. 2007), the same court rejected agencies' *Glomar* responses because the agencies had officially acknowledged information sufficient to establish the existence of records about the subjects of the requests.

Here, while neither Mr. Trump nor Mr. Solomon are current officials, Mr. Trump—who purportedly issued the Alleged Declassification Standing Order while President—designated Mr. Solomon to serve as his representative under the Presidential Records Act ("PRA").  PSOF ¶ 34.  The PRA establishes "the public ownership of presidential records and ensure[s] the preservation of presidential records for public access after the termination of a President's term in office." *Citizens for Responsibility & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 130 (D.D.C.

2018) (quoting *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991)).  The PRA directs that the "President shall take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's . . . duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to" the statute.  44 U.S.C. § 2203(a).  It also gives the President responsibility over "custody, control, and access" to Presidential records[6] during their term in office.  44 U.S.C. § 2203(f).  An incumbent President retains a degree of long-term control over the records, for example the ability to assert and lift restrictions on public access to certain records for up to twelve years.  36 C.F.R § 1270.40(a), (c).  A former President may designate a representative for access to the restricted Presidential records of that President's administration.  36 C.F.R. 1270.44(a).  Former President Trump designated Mr. Solomon.  PSOF ¶ 34.

Mr. Solomon, acting at Mr. Trump's direction, publicly asserted the existence of the Alleged Declassification Standing Order—he read the purported substance of the order aloud on television.  PSOF ¶ 35.  Mr. Solomon prefaced this statement by saying that, "Tonight, President Trump, through his official office in Mar-a-Lago, has provided this show and Just the News, the following statement. . . .  This is from President Trump's office."  PSOF ¶ 36.[7]  Mr. Solomon's statement, both by virtue of his statutorily-designated status as a former President's representative

---

[6] "Presidential records" is defined as "documentary materials, or any reasonably seg-regable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2).

[7] Former President Trump bolstered these claims on social media, writing on August 12, 2022: "Number one, it was all declassified. Number two, they didn't need to 'seize' anything. They could have had it anytime they wanted without playing politics and breaking into Mar-a-Lago." PSOF ¶ 37. And on August 31, 2022: "Terrible the way the FBI, during the Raid of Mar-a-Lago, threw documents haphazardly all over the floor (perhaps pretending it was me that did it!), and then started taking pictures of them for the public to see. Thought they wanted them kept Secret? Lucky I Declassified!" PSOF ¶ 37.

under the PRA and because it originated from a former President, acknowledged information sufficient to preclude a *Glomar* response.  *See ACLU v. CIA*, 710 F.3d at 425-26 (D.C. Cir. 2013); *Wolf*, 473 F.3d at 379; *Boyd*, 475 F.3d at 389.  ACLUM is, of course, highly skeptical that the alleged declassification order actually exists, but, if it does, it has clearly been acknowledged by these statements.

## CONCLUSION

For the foregoing reasons, ACLUM respectfully asks the Court to deny Defendants' motion for summary judgment and grant ACLUM's cross-motion for summary judgment.  The Court should then order Defendants to search for, process, and produce responsive records, after which any remaining disputes can be resolved through motion practice, if needed.

Dated: March 6, 2023

Respectfully submitted,

*/s/ Natalie F. Panariello*
Christopher E. Hart (BBO #625031)
Natalie F. Panariello (BBO #707579)
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000
chart@foleyhoag.com
npanariello@foleyhoag.com

Daniel L. McFadden (BBO #676612)
Matthew R. Segal (BBO #654489)
American Civil Liberties Union
Foundation of Massachusetts, Inc.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
dmcfadden@aclum.org

*Counsel for Plaintiff*