## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | ) |
| --- | --- |
| **AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No. 22-cv-11532-DJC** |
| | ) |
| **THE CENTRAL INTELLIGENCE AGENCY, THE OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, THE UNITED STATES DEPARTMENT OF DEFENSE, and THE NATIONAL SECURITY AGENCY,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

_____

### MEMORANDUM AND ORDER

**CASPER, J.**                                                          **May 11, 2023**

## I.      Introduction

The American Civil Liberties Union of Massachusetts, Inc. ("ACLUM") filed this lawsuit

pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, against the Central

Intelligence Agency ("CIA"), the Office of the Director of National Intelligence ("ODNI"), the

United States Department of Defense ("DoD"), and the National Security Agency ("NSA")

(collectively, "Defendants"), relating to an alleged standing order issued by former President

Donald J. Trump ("Trump") regarding the declassification of documents ("Alleged

Declassification Standing Order").  D. 1.  Presently before the Court is Defendants' motion for

summary judgment, D. 24, and the ACLUM's cross-motion for summary judgment, D. 27.  For

the reasons explained below, the Court DENIES Defendants' motion for summary judgment, D.

24, and ALLOWS the ACLUM's cross-motion for summary judgment to the extent that it seeks to have Defendants confirm or deny the existence of records responsive to its FOIA requests, D. 27.

## II.    Standard of Review

The Court grants summary judgment where "there is no genuine dispute as to any material fact" and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law."  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (citation and internal quotation marks omitted).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000) (citations omitted).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial, Borges v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citing cases).  The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citation omitted).

"FOIA cases are typically decided on motions for summary judgment."  Am. C.L. Union of Mass., Inc. v. U.S. Immigr. & Customs Enf't, 448 F. Supp. 3d 27, 35 (D. Mass. 2020) (citation and internal quotation marks omitted).  Summary judgment is warranted for a defendant in a FOIA case "when the agency proves that it has fully discharged its obligations under the FOIA after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester."  Crooker v. Tax Div. of U.S. Dep't of Just., No. 94-30129 MAP, 1995 WL

783236, at *7 (D. Mass. Nov. 17, 1995) (citation and internal quotation marks omitted).  An agency discharges its burden when it "proves that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the [FOIA's] inspection requirements."  Gillin v. IRS, 980 F.2d 819, 821 (1st Cir. 1992) (alteration in original) (citations omitted).  "This burden does not shift even when the requester files a cross-motion for summary judgment because the Government ultimately [has] the onus of proving that the [documents] are exempt from disclosure, while the burden upon the requester is merely to establish the absence of material factual issues before a summary disposition of the case could permissibly occur."  Leopold v. Dep't of Just., 301 F. Supp. 3d 13, 21 (D.D.C. 2018) (alterations in original) (quoting Pub. Citizen Health Res. Grp. v. FDA, 185 F.3d 898, 904–05 (D.C. Cir. 1999)) (internal quotation marks omitted).

## III.    Factual Background

Unless otherwise noted, the following facts are undisputed.  These facts are primarily drawn from Defendants' statement of undisputed material facts, D. 24-3, the ACLUM's response to same and statement of additional facts, D. 27-2, Defendants' response to the ACLUM's statement of additional facts, D. 30-2, and supporting documentation.

### A.    The Investigation and Alleged Declassification Standing Order

Throughout 2021, the United States National Archives and Records Administration ("NARA") had ongoing communications with Trump representatives, in which it sought alleged missing records from his administration.  D. 27-2 at 23, 29.  After this series of communications, Trump provided the NARA with fifteen boxes on January 18, 2022.  Id. at 16–17, 23, 29, 32.  According to the NARA, its initial review of these boxes revealed highly classified documents intermingled with other records.  Id. at 16.  As such, the NARA sent a referral ("the NARA

Referral") to the United States Department of Justice ("DOJ") on February 9, 2022.  D. 30-2 ¶ 33.

The NARA Referral stated that a preliminary review of the boxes indicated that they contained

"newspapers, magazines, printed news articles, photos, miscellaneous print-outs, notes,

presidential correspondence, personal and post-presidential records, and a lot of classified records.

Of most significant concern was that highly classified records were unfoldered, intermixed with

other records, and otherwise [im]properly . . . identified."  D. 27-2 at 23 (internal quotation marks

omitted).

Following receipt of the NARA Referral, the Federal Bureau of Investigations ("FBI")

began a criminal investigation into the Trump administration regarding the potential improper

removal and storage of classified information in unauthorized spaces, as well as the potential

unlawful concealment or removal of government records.  Id. at 3; D. 30-2 ¶ 33.  Between May

16–18, 2022, the FBI conducted a preliminary review of the documents and identified documents

with classification markings in fourteen of the boxes.  D. 27-2 at 32.  This preliminary review

revealed 184 unique documents bearing the following classification markings:  67 documents

marked as CONFIDENTIAL, 92 documents marked as SECRET, and 25 documents marked as

TOP SECRET.  Id.  Further, the FBI observed markings reflecting that the documents were subject

to sensitive compartments and dissemination controls used to restrict access to material in the

interest of national security.  Id.

On August 8, 2022, FBI agents searched "Mar-a-Lago"—Trump's residence and club—

and seized classified documents.  Id. ¶ 3.  Four days later, on August 12, 2022, John Solomon

("Solomon"), one of Trump's designated representatives for access to Presidential records of his

administration pursuant to the Presidential Records Act, read a statement from Trump on

television.  D. 30-2 ¶¶ 34–35.  The statement asserted that while Trump "often took documents,

including classified documents, to the residence," he "had a standing order that documents removed from the Oval Office and taken to the residence were deemed to be declassified the moment he removed them."  Id. ¶ 35.  Later, Trump reiterated his statement as to the alleged declassification on social media, stating, "Number one, it was all declassified."  Id. ¶ 37.  A few weeks later, on August 31, 2022, Trump stated on social media, "Terrible the way the FBI, during the Raid of Mar-a-Lago, threw documents haphazardly all over the floor (perhaps pretending it was me that did it!), and then started taking pictures of them for the public to see.  Thought they wanted them kept Secret?  Lucky I Declassified!"  Id.  Soon thereafter, several former Trump administration officials, including former National Security Advisor John Bolton, former United States Attorney General William Barr, and former White House Chiefs of Staff John Kelly and Mick Mulvaney, denied the existence of the Alleged Declassification Standing Order.  Id. ¶ 38.

The FBI's criminal investigation is ongoing.  D. 27-2 ¶ 5.  On November 18, 2022, Attorney General Merrick Garland announced the appointment of Special Counsel Jack Smith ("Smith") to oversee the investigation.  D. 24-2, Declaration of Michael G. Seidel ("Seidel Decl.") ¶ 5 n.1.

B.   **ACLUM's FOIA Requests**

On August 15 and 16, 2022, the ACLUM submitted FOIA requests to the Department of Homeland Security ("DHS"), the National Geospatial-Intelligence Agency ("NGA"), and the National Reconnaissance Office ("NRO"), in addition to Defendants. D. 30-2 ¶ 16.  These requests sought the production of:

> 1. The Alleged Declassification Standing Order.
> 2. Any written transmittal of the Alleged Declassification Standing Order from the Executive Office of the President of the United States to [the respective department or agency], including by letter, memoranda, or email.
> 3. All records created by [the respective department or agency] that were declassified pursuant to the Alleged Declassification Standing Order.

D. 27-2 ¶ 1.

In response to the FOIA request, in a letter dated September 8, 2022, the NGA stated that an "extensive search of [NGA] records failed to identify any documents in our files that are responsive to your request." D. 30-2 ¶ 17. On September 12, 2022, the DHS responded that, after a "comprehensive search of files with The Office of the Executive Secretary (ESEC) and the Office of the Chief Information Officer (OCIO)," it was "unable to locate or identify any responsive records." Id. ¶ 18. On February 24, 2023, the NRO stated that "[a]fter a thorough search" of its record and databases, it "located no NRO-originated records" responsive to the requests. Id. ¶ 19. None of these federal agencies invoked *Glomar*[1] or Exemption 7(A) for their responses. See D. 27-10; D. 27-11; D. 27-16; D. 27-17. Finally, in letters dated January 2023, Defendants responded to the requests outside the statutory timeframe, by issuing *Glomar* responses based upon the FBI's determination, made in consultation with Special Counsel Smith's office, that confirming or denying the existence of responsive records could reasonably be expected to interfere with the FBI's criminal investigation. D. 27-2 ¶ 7; D. 30-2 ¶ 20.

## IV.    Procedural History

On September 19, 2022, the ACLUM commenced this action. D. 1. After both parties moved for summary judgment, D. 24; D. 27, the Court heard the parties and took the matter under advisement, D. 32.

---

[1] A *Glomar* response "derives its name from a ship, the *Hughes Glomar Explorer*, built (we now know) to recover a sunken Soviet submarine, but disguised as a private vessel for mining manganese nodules from the ocean floor." Carpenter v. U.S. Dep't of Just., 470 F.3d 434, 436 n.3 (1st Cir. 2006) (citation and internal quotation marks omitted).

## V.      Discussion

The FOIA requires disclosure of federal agency records upon request, 5 U.S.C. § 552(a)(3), "to facilitate public access to Government documents and . . . to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny," Union Leader Corp. v. U.S. Dep't of Homeland Sec., 749 F.3d 45, 49–50 (1st Cir. 2014) (quoting U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991)) (internal quotation marks omitted).  "The basic policy of full agency disclosure within the FOIA furthers the right of citizens to know what their government is up to, . . . and promotes an informed citizenry, which is vital to democracy." Carpenter, 470 F.3d at 437–38 (internal citations and quotation marks omitted).

This is not to say that "[t]his right of access is . . . absolute." Union Leader Corp., 749 F.3d at 50 (citations omitted).  To the contrary, "[t]o effectuate the goals of the FOIA while safeguarding the efficient administration of the government, the FOIA provides that certain categories of materials are exempted from the general requirements of disclosure." Carpenter, 470 F.3d at 438 (citations omitted).  There are nine specific statutory exemptions, which "are to be construed narrowly, with any doubts resolved in favor of disclosure." Id. (citing cases).  "[I]n keeping with [the] FOIA's underlying presumption in favor of broad disclosure, the government agency bears the burden of proving the applicability of a specific statutory exemption." Union Leader Corp., 749 F.3d at 50 (citing cases).  To determine whether a specific statutory exemption applies, courts must "employ[] a de novo review [and] find an adequate factual basis to support the agency's assertion of the exemption." Town of Winthrop v. FAA, 328 F. App'x 1, 5 (1st Cir. 2009) (citation omitted).

"As an alternative to producing requested records or withholding such records under an established FOIA exemption, an agency may also respond to a FOIA request by issuing what has

come to be known as a '*Glomar*' response." Eddington v. U.S. Dep't of Just., 581 F. Supp. 3d 218, 224 (D.D.C. 2022) (citing cases). Such a response "permits an agency to 'refuse to confirm the existence of records where to answer the FOIA inquiry would cause harm cognizable under a[] FOIA exemption,'" Casey v. FBI, 302 F. Supp. 3d 209, 212 (D.D.C. 2018) (alteration in original) (quoting Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007)), but an agency is only permitted to do so in the "rare situation when either confirming or denying the very existence of records responsive to a request would cause harm cognizable under an FOIA exception," Bartko v. U.S. Dep't of Just., 898 F.3d 51, 63 (D.C. Cir. 2018) (citation and internal quotation marks omitted)); see Am. C.L. Union v. CIA, 710 F.3d 422, 426 (D.C. Cir. 2013) (explaining that *Glomar* responses are appropriate only "in limited circumstances" (citation omitted)). "To the extent the circumstances justify a *Glomar* response, the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents." Lindsey v. FBI, 271 F. Supp. 3d 1, 4 (D.D.C. 2017) (alteration, citation, and internal quotation marks omitted). "In determining whether the existence of agency records *vel non* fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases," Wolf, 473 F.3d at 374, which means that "an agency's justification for invoking a FOIA exemption, whether directly or in the form of a *Glomar* response, is sufficient if it appears logical or plausible," Am. C.L. Union v. CIA, 710 F.3d at 427 (citation and internal quotation marks omitted). Accordingly, a *Glomar* response is "proper if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." Wolf, 473 F.3d at 374 (citing cases). The issuance of a *Glomar* response, however, must be based upon a "detailed [agency] affidavit," BuzzFeed, Inc. v. Dep't of Just., 344 F. Supp. 3d 396, 403 (D.D.C. 2018) (citing Elec. Privacy Info. Ctr. v. NSA, 678 F.3d 926, 931 (D.C. Cir. 2012)), which "contain[s] reasonable specificity of detail rather than merely conclusory

statements, and [is] not called into question by contradictory evidence in the record or by evidence of agency bad faith," Elec. Privacy Info. Ctr., 678 F.3d at 931 (citation and internal quotation marks omitted).

One FOIA exemption that can provide the basis for a *Glomar* response is Exemption 7(A). Eddington, 581 F. Supp. 3d at 225 (citing, *inter alia*, Leopold, 301 F. Supp. 3d at 21–27). "Exemption 7(A) excludes from the sweep of FOIA 'records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information could reasonably be expected to interfere with enforcement proceedings.'" Am. C.L. Union of Mass. v. Immigr. & Customs Enf't, No. 21-CV-10761-AK, 2022 WL 1912882, at *7 (D. Mass. June 3, 2022) (quoting 5 U.S.C. § 552(b)(7)(A)).  The First Circuit has instructed that Exemption 7(A) leaves "no room for judicial balancing" and if the court concludes the requested documents were compiled for law enforcement purposes, "the inherent nature of the requested documents is irrelevant to the question of exemption." Curran v. Dep't of Just., 813 F.2d 473, 474 (1st Cir. 1987) (citation and internal quotation marks omitted).  The key inquiry, therefore, "becomes whether revelation of the data will tend to obstruct, impede, or hinder enforcement proceedings." Id.  For an agency to invoke Exemption 7(a), it must make a "minimally sufficient showing" that is "clear enough to permit a court to ascertain how each . . . category of documents, if disclosed, would interfere with the investigation." Id. at 475 (citation and internal quotation marks omitted).

After the issuance of a *Glomar* response, a requester is not without recourse, as they "may challenge a *Glomar* response in two distinct but related ways." James Madison Project v. Dep't of Just., 302 F. Supp. 3d 12, 20 (D.D.C. 2018) (citation and internal quotation marks omitted). "First, a requester can challenge the agency's assertion that confirming or denying the existence

of records would cause harm under the FOIA exception invoked by the agency. . . .  Second, a requester can demonstrate that the agency has previously 'official[ly] acknowledged' the fact of the existence of a requested record."  Id. (internal citations omitted).  If the requester demonstrates that the agency has "officially acknowledged" that it possesses responsive records to the FOIA request, "the agency can no longer use a *Glomar* response" and must either "(1) disclose the record to the requester or (2) establish that its contents are exempt from disclosure and that such exemption has not been waived."  Moore v. CIA, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (citation omitted).

Here, each Defendant issued a *Glomar* response to the ACLUM's FOIA requests, relying upon Exemption 7(A):

> In coordination with the . . . FBI . . . , a federal law enforcement agency, we can neither confirm nor deny whether we possess records responsive to your request pursuant to FOIA Exemption (b)(7)(A) [5 U.S.C.§552 (b)(7)(A)].  A confirmation that we have or do not have responsive records would be tantamount to acknowledging the existence or nonexistence of aspects of an ongoing investigation that the FBI has not previously acknowledged.  The FBI has advised that 1) if the requested records exist, they would be relevant to the FBI's ongoing investigation and 2) confirmation by [the respective Defendant] as to the existence or nonexistence of such records could reasonably be expected to interfere with the ongoing investigation.  Accordingly, [the respective Defendant] neither confirms nor denies the existence of records pursuant to FOIA Exemption (b)(7)(A) [5 U.S.C.§552 (b)(7)(A)].

D. 27-12; D. 27-13; D. 27-14; D. 27-15.  In support of their *Glomar* responses and motion for summary judgment, Defendants filed an affidavit from Michael G. Seidel ("Seidel"), the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), FBI, discussing why the FBI believes the issuance of *Glomar* responses and their reliance upon Exemption 7(A) is appropriate in this case.  D. 24-2.  The ACLUM challenges the propriety of Defendants' *Glomar* responses and the substance of Seidel's affidavit through three inter-related arguments:  (1) Defendants have not shown that they compiled the requested

records for law enforcement purposes; (2) Defendants' have not shown that disclosure of the existence or nonexistence of the Alleged Declassification Standing Order and other responsive documents is reasonably likely to interfere with enforcement proceedings; and (3) the existence of responsive records has been officially acknowledged by Trump.  D. 27-1 at 7–20.

A.     <u>Exemption 7 Threshold Question</u>

"In order to withhold documents under Exemption 7, the agency must, as a preliminary matter make a threshold showing demonstrating that the records were compiled for a law enforcement purpose." <u>100Reporters LLC v. U.S. Dep't of Just.</u>, 248 F. Supp. 3d 115, 159 (D.D.C. 2017) (citation and internal quotation marks omitted).  To satisfy its burden that the records were compiled for law enforcement purposes, an agency must establish "(1) a rational nexus between the investigation and one of the agency's law enforcement duties; and (2) a connection between an individual or incident and a possible security risk or violation of federal law." <u>Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.</u>, 331 F.3d 918, 926 (D.C. Cir. 2003) (citation and internal quotation marks omitted).  Here, Seidel explains:

> the existence or non-existence of the "Alleged Declassification Standing Order" would bear on whether records with apparent classification markings were in fact classified—a key fact in the investigation.  That investigation is within the law enforcement duties of the FBI, and therefore, any records compiled as part of that investigation would be compiled for law enforcement purposes.

D. 24-2 ¶ 12.  While this explanation might otherwise demonstrate that the FBI's investigation into the removal of classified documents relates to its law enforcement duties and that the Alleged Declassification Standing Order is directly related to that investigation, <u>see</u> <u>Gilman v. U.S. Dep't of Homeland Sec.</u>, 32 F. Supp. 3d 1, 19 (D.D.C. 2014) (concluding that Exemption 7 threshold question was satisfied where "CBP's declarations sufficiently demonstrate that the redacted information is related to the enforcement of federal laws, as the assessment of border

vulnerabilities is directly related to the potential violation of federal immigration laws and the CBP's duty to deter illegal immigration and to apprehend illegal immigrants" (citing Tax Analysts v. IRS, 294 F.3d 71, 78 (D.C. Cir. 2002)), the ACLUM argues that Seidel's explanation is insufficient here for two reasons.

First, it argues that, to the extent the Alleged Declassification Standing Order exists, it would have been a document of an inherently public nature and that no FOIA exemption "would have applied to the alleged order prior to the FBI's initiating its investigation after the end of the Trump Administration." D. 27-1 at 8–9. But the ACLUM has not proffered any caselaw to suggest that an otherwise public document cannot become subject to the FOIA's protection because of its eventual relevance to a law enforcement investigation or proceeding. Indeed, the Supreme Court appears to have suggested otherwise when it rejected a distinction "between documents that originally were assembled for law enforcement purposes and those that were not so originally assembled but were gathered later for such purposes," explaining that "the plain language of Exemption 7 does not permit such a distinction [and] [u]nder the statute, documents need only to have been compiled when the response to the FOIA request must be made." John Doe Agency v. John Doe Corp., 493 U.S. 146, 155 (1989). This suggests that documents that were not previously secret or exempt under the FOIA can become subject to those protections once they are compiled for law enforcement purposes.

Second, the ACLUM argues that Seidel's explanation is insufficient because the FBI is not a defendant in this matter and the ACLUM never requested documents from the FBI. D. 27-1 at 8–13. In other words, the ACLUM argues that "the law does not say that pre-existing public records held by other agencies must vanish merely because they become of interest to the FBI, and [the] ACLUM has not sought any information from the files of the FBI itself." Id. at 9. It proceeds

to argue that there is no evidence in the record that any Defendant compiled the requested records for a law enforcement purpose; rather, to the extent any responsive records exist, those records were merely transmitted from the Executive Office of the President of the United States to the respective Defendant.  Id. at 10–11.  Furthermore, the ACLUM argues that there is no evidence that any responsive records are "connected to any law enforcement purpose of ODNI, CIA, DoD, or NSA, or that these entities have any law enforcement duties relevant to this case."  Id. at 11.  Finally, it argues that "[i]f this document exists and resides with multiple agencies, and if those agencies acquired it for reasons having nothing to do with FBI's law enforcement *investigation*, then those agencies' possession of that document has nothing to do with the FBI's law enforcement *purpose*" and that, should the Court grant Defendants' motion, it would grant the FBI the power to "erase a public document residing in the files of *other departments or agencies* simply by making a unilateral decision to open an investigation or to collect a copy of the document for an investigation," a "power [that] could easily be abused (including by future presidential administrations), and would be antithetical to the purpose of the statute."  Id. at 11, 13 (italics in original).

Defendants respond that "[n]othing in the statute requires the agency withholding the materials to be the same agency that compiled the information for law enforcement purposes, and no case law imposes such a requirement."  D. 30 at 6.  To impose such a requirement, in Defendants' view, "would leave law enforcement investigations implicating information at other government agencies utterly and uniquely without protection" and incentivize FOIA requesters to strategically submit their requests to bypass application of Exemption 7.  Id. at 7.  Defendants further rely on the Supreme Court's instruction that "[t]he statutory provision that records or information must be 'compiled for law enforcement purposes' is not to be construed in a

nonfuctional way" and that "[i]n applying Exemption 7, the Court carefully has examined the effect that disclosure would have on the interest the exemption seeks to protect." Id. at 8 (quoting John Doe Agency, 493 U.S. at 157). Finally, Defendants argue that the FBI has not engaged in any abuses of its authority in invoking Exemption 7(A). Id. at 10–11.

The Court begins its analysis with the text of the statute. John Doe Agency, 493 U.S. at 153 (stating that "[a]s is customary, we look initially at the language of the statute itself"). Exemption 7(A) provides:

> [t]his section does not apply to matters that are . . . records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings.

5 U.S.C. § 552(b)(7)(A). This language does not appear to require the receiving agency to be the same agency that compiled the information for law enforcement purposes; rather, it requires that the information be compiled for law enforcement purposes. This reading of the statutory language also appears consistent with the broader statutory framework, because the FOIA explicitly envisions consultation with non-party agencies. 5 U.S.C. § 552(a)(6)(B)(iii)(III) (allowing an agency to extend the statutory deadline to respond to a FOIA request, where there is a "need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein").

Furthermore, this reading of the statute appears consistent with Supreme Court caselaw. In John Doe Agency v. John Doe Corp.—the decision in which the Supreme Court held that information not initially created or compiled for law enforcement purposes nonetheless fulfills Exemption 7's threshold requirement if it is subsequently compiled for a valid law enforcement purpose at any time prior to "when the Government invokes the Exemption"—the Court

announced important principles as to the interpretation of FOIA exemptions and, specifically, Exemption 7. John Doe Agency, 493 U.S. at 153. The Court instructed that "[d]espite these pronouncements of liberal congressional purpose, this Court has recognized that the statutory exemptions are intended to have meaningful reach and application." Id. at 152, 157. Specifically as to Exemption 7, the Court highlighted that "[i]n applying Exemption 7, the Court carefully has examined the effect that disclosure would have on the interest the exemption seeks to protect" and that "[t]he statutory provision that records or information must be 'compiled for law enforcement purposes' is not to be construed in a nonfictional way." Id. at 157 (citing cases). As "[t]he principal purpose of Exemption 7(A) is to prevent disclosures which might prematurely reveal the government's cases in court, its evidence and strategies, or the nature, scope, direction, and focus of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to destroy or alter evidence," Maydak v. U.S. Dep't of Just., 218 F.3d 760, 762 (D.C. Cir. 2000) (citations omitted), the ACLUM's interpretation of the statute would appear "nonfunctional" and limit Exemption 7's "meaningful reach and application" because any requester could bypass its application by submitting its request to certain agencies and not others.

Defendants also offered one example in which it appears that an agency invoked Exemption 7(A) even though it was a non-party agency that compiled the information for the non-party agency's law enforcement purpose. In Performance Coal Co. v. U.S. Dep't of Lab., 847 F. Supp. 2d 6, 16 (D.D.C. 2012), the Mine Safety and Health Administration ("MSHA") sought to withhold a page of handwritten notes about ventilation at a particular mine under Exemption 7(A) "to prevent any interference with an ongoing criminal FBI investigation." The MSHA supported its arguments with two affidavits—one from the FBI and another from the MSHA—and the court ultimately concluded that the MSHA "properly asserted Exemption 7(A)." Id.

At this juncture given the *Glomar* responses, however, even assuming *arguendo* that the FBI compiled the records for law enforcement purposes and the invocation of Exemption 7 by the Defendants on behalf of the FBI is proper, Defendants have not shown that merely confirming or denying the existence of the Alleged Declassification Standing Order and the other responsive documents is likely to interfere with law enforcement proceedings.

**B.      Exemption 7(A)**

"Once the threshold inquiry of Exemption 7 is satisfied, an agency may withhold documents under Exemption 7(A) if their disclosure 'could reasonably be expected to interfere with enforcement proceedings.'" Lewis v. U.S. Dep't of Treasury, No. 17-cv-0943 (DLF), 2020 WL 1667656, at *3 (D.D.C. Apr. 3, 2020) (quoting 5 U.S.C. § 552(b)(7)(A)).  This exemption embodies Congress's recognition that "law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 224 (1978).

Defendants submitted Seidel's affidavit to justify their invocation of Exemption 7(A).  Of the eighteen paragraphs in Seidel's affidavit, only one paragraph addresses how Defendants' disclosure of the existence or nonexistence of the Alleged Declassification Standing Order could reasonably be expected to interfere with the FBI's investigation and enforcement proceedings:

> If evidence regarding the existence or nonexistence of the "Alleged Declassification Standing Order" were disclosed at this stage of the FBI's investigation, such a disclosure could reasonably be expected to hamper and interfere with the pending investigation.  This is because confirmation or denial of whether CIA, ODNI, DoD, and/or NSA has the "Alleged Declassification Standing Order," or documents that establish its existence, would disclose facts gathered during the course of the pending investigation that might lead persons of interest to alter their testimony; destroy, adulterate, or fabricate evidence; or refuse to cooperate with the government altogether.  Any testimony gathered after the disclosure could thus be tainted, since each person the FBI interviewed thereafter

would have the opportunity to mold his or her statements in light of the prematurely disclosed evidence.  More than that, confirmation or denial of the existence or non-existence of responsive records would provide those intent on interfering with the investigation additional pieces of information necessary to target their behaviors to maximize the effect of any efforts to undermine the investigation.  This, in turn, reasonably could be expected to severely hamper the FBI's ability to ascertain the truth and, assuming there was a violation of the law, for the matter to be successfully prosecuted.

D. 24-2 ¶ 16.

Such explanation does not satisfy Defendants' burden, particularly given the entirety of the record here.  While Defendants' justification for invoking *Glomar* and Exemption 7(A) need only be "logical or plausible," <u>Am. C.L. Union v. CIA</u>, 710 F.3d at 427 (citation and internal quotation marks omitted), the standard is not toothless either as """exemptions from disclosure must be narrowly construed, and conclusory and generalized allegations of exemptions are' insufficient," <u>Stonehill v. U.S. Dep't of Just. Tax Div.</u>, No. 1:19-cv-03770, 2022 WL 407145, at *14 (D.D.C. Feb. 10, 2022) (quoting <u>Morley v. CIA</u>, 508 F.3d 1108, 1114–15 (D.C. Cir. 2007)); <u>see</u> <u>Curran</u>, 813 F.2d at 475 (explaining that "merely because a piece of paper has wended its way into an investigative dossier created in anticipation of enforcement action, an agency—even one having a function as sensitive as the FBI—cannot automatically disdain to disclose it").  Moreover, the affidavit upon which they rely must "contain reasonable specificity of detail rather than merely conclusory statements," and must not be "called into question by contradictory evidence in the record or by evidence of agency bad faith." <u>Elec. Privacy Info. Ctr.</u>, 678 F.3d at 931 (citation and internal quotation marks omitted); <u>see</u> <u>Dalal v. U.S. Dep't of Just.</u>, No. 16-1040 (TJK), 2022 WL 17092863, at *22 (D.D.C. Nov. 21, 2022) (explaining that "[a]n agency issuing a *Glomar* response must explain in as much detail as possible why it cannot confirm or deny the existence of certain records or categories of records, which it may seek to do by affidavit" (citation omitted)).  Here, however, there is contradictory evidence.

Three agencies—namely, the DHS, NGA, and NRO—already have responded to the ACLUM's FOIA requests and stated that they do not have any responsive records.  D. 27-10; D. 27-11; D. 27-16; D. 27-17.  Seidel's affidavit is silent as to how additional confirmation from Defendants would lead to any interference with the FBI's investigation, where multiple other agencies have already disclosed the non-existence of responsive records in their respective possession.  See generally D. 24-2.  Seidel's affidavit is also silent as to whether any of the alleged interference or harm has already occurred in light of the DHS's, NGA's, and NRO's disclosures.  See generally id.  While it is certainly true that "a third party agency's disclosures cannot waive the asserting agency's right to a *Glomar* response, . . . such disclosures may well shift the factual groundwork upon which a district court assesses the merits of such a response."  Florez v. CIA, 829 F.3d 178, 186–89 (2d Cir. 2016) (remanding to the lower court to assess whether the CIA adequately justified its *Glomar* response where the FBI made disclosures that could affect the reasonableness of the CIA's justification).[2]

The only response Defendants offer comes not in Seidel's affidavit, but in their brief where they argue the DHS's, NGA's, and NRO's disclosures are "without moment because [they do] not affect the harm to the investigation that would occur by revealing that any of Defendant agencies

---

[2] Defendants take issue with the ACLUM's citation to Florez in a section of its brief discussing the government's burden in FOIA cases—particularly, with the language in Florez that states agencies can only rely on a *Glomar* response under "unusual circumstances, and only by a particularly persuasive affidavit."  D. 30 at 4; Florez, 829 F.3d at 182 (citing cases).  Defendants argue that the D.C. Circuit declined to follow this language.  D. 30 at 4; Knight First Amend. Inst. at Columbia Univ. v. CIA, 11 F.4th 810, 818 (D.C. Cir. 2021) (noting that plaintiff cited only Florez, "one out-of-circuit case," in support of that approach).  Even assuming the D.C. Circuit cast doubt on that language in Florez, the Court here does not cite Florez for that proposition.  Rather, the Court cites it for the idea that another agency's disclosures or public statements can affect the logic and plausibility of a responding agency's invocation of a FOIA exemption, for which the Second Circuit explicitly cited the D.C. Circuit's Elec. Privacy Info. Ctr. decision.  Florez, 829 F.3d at 186 (citing Elec. Privacy Info. Ctr., 678 F.3d at 931).

does or does not have records responsive to Plaintiff's request." D. 30 at 13. They go on to argue that any response from Defendants "would be significantly more informative—and therefore damaging to the investigation—than the isolated responses [the ACLUM] has received" because Defendants comprise the head and majority of the intelligence community. Id. at 13–14. Even on this score, however, the NGA, NRO, and two elements of the DHS, the Office of Intelligence and Analysis and the U.S. Coast Guard Intelligence, are members of this intelligence community and the NGA, NRO, and DHS have already responded to the ACLUM's FOIA request without invoking *Glomar* or Exemption 7(A). D. 30-2 ¶¶ 17–19; see Office of the Director of National Intelligence, Members of the IC, https://www.dni.gov/index.php/what-we-do/members-of-the-ic (last visited May 11, 2023). Defendants have proffered no reason as to why responses from these members of the intelligence community would be any less informative than responses from Defendants.

Defendants also emphasize that Defendants here include the head of the intelligence community, the ODNI, and the Department of Defense, where nine organizations of the intelligence community reside. D. 30 at 13–14. But there is no explanation as to why it must be an all-or-nothing approach. In other words, if the potential harm is that the ODNI's and DOD's disclosure would be more informative than the disclosure of the DHS, NGA, and NRO, there is no explanation as to why the invocation of *Glomar* and Exemption 7(A) by certain other Defendants, like the CIA, is proper, especially where certain members of the intelligence community have already responded to the ACLUM's request. Ultimately, the DHS's, NGA's, and NRO's disclosures make Defendants' and the FBI's invocation of *Glomar* and Exemption 7(A) less logical or plausible, because the FBI never claimed that these disclosures interfered with its investigation. Courts have recognized that a non-party agency's disclosure affects the merits of asserting a

*Glomar* response and might warrant further explanation from the responding agency.  See, e.g.,
Florez, 829 F.3d at 187 (explaining that "[i]t defies reason to instruct a district court to deliberately
bury its head in the sand to relevant and contradictory record evidence solely because that evidence
does not come from the very same agency seeking to assert a *Glomar* response in order to avoid
the strictures of FOIA"); White v. Dep't of Just., 460 F. Supp. 3d 725, 738 (N.D. Ill. 2020)
(explaining that "a prior disclosure by a *different* agency does not waive the right of a responding
agency to make a *Glomar* response, although it may bear on the merits of asserting such a
response" (italics in original) (citation omitted)); Am. C.L. Union v. Dep't of Def., No. CV 18-
154-M-DWM, 2019 WL 3945845, at *12 (D. Mont. Aug. 21, 2019) (explaining that the "[Bureau
of Land Management's] disclosures revealing responsive FBI documents are relevant to whether
the FBI has sufficiently explained that the records' existence or nonexistence is exempt from
disclosure. . . .  The FBI must show the harm contemplated by the claimed exemptions is likely to
occur, notwithstanding [Bureau of Land Management's] disclosures" (internal citation omitted));
Am. C.L. Union v. Dep't of Def., 492 F. Supp. 3d 250, 260 (S.D.N.Y. 2020) (concluding that a
subsequent disclosure by the same agency "shift[ed] the factual groundwork on which the Court
examines the propriety of the FOIA Exemptions" and made "the continued use of that exemption
illogical and implausible" (alteration in original) (citation and internal quotation marks omitted));
cf. James Madison Project, 302 F. Supp. 3d at 31 (stating that "Plaintiffs have not identified any
public statements that would render Hardy's substantive justifications for issuing a Glomar
response 'neither logical nor plausible'").

Moreover, not only did the DHS, NGA, and NRO state that they do not have responsive
records, but over a dozen former top Trump administration officials have denied the existence of
the Alleged Declassification Standing Order.  D. 30-2 ¶ 38.  These denials were issued publicly

and to national news outlets, so to the extent the FBI is concerned that additional confirmation or denial from Defendants "might lead persons of interest to alter their testimony; destroy, adulterate, or fabricate evidence; . . . refuse to cooperate with the government altogether; . . . [or] to mold his or her statements in light of the prematurely disclosed evidence[;] . . . [or] provide those intent on interfering with the investigation additional pieces of information necessary to target their behaviors to maximize the effect of any efforts to undermine the investigation," it appears that such persons would already have access to that information.  D. 24-2 ¶ 16.

Moreover, to the extent responsive records do exist, Trump has already asserted that the Alleged Declassification Standing Order exists on national television, a forum where such persons were likely to hear it.  D. 30-2 ¶¶ 35–37.  Along these lines, it is not only Defendants and the FBI that have knowledge as to whether the order and other responsive records exist; that knowledge is also in Trump's possession.  This further undermines Defendants' invocation of Exemption 7(A) for their *Glomar* responses.  Cf. Campbell v. Dep't of Health and Hum. Servs., 682 F.2d 256, 265 (D.C. Cir. 1982) (concluding that a "district court must conduct a more focused and particularized review of the documentation on which the government bases its claim" for withholding investigation records, where the target of the investigation already possesses them); Chesapeake Bay Found., Inc. v. U.S. Army Corps of Eng'rs, 677 F. Supp. 2d 101, 108 (D.D.C. 2009) (concluding defendant's invocation of Exemption 7 was deficient where it failed to "explain how its investigation will be impaired by the release of information that the targets of the investigation *already possess*" (italics in original) (citation omitted)).

Seidel's affidavit offers no explanation as to how Defendants' confirmation or denial of the existence or non-existence of responsive records would interfere with the FBI's investigation where multiple other agencies (including members of the intelligence community), multiple,

former Trump administration officials, and Trump himself have issued public statements on the subject.  Without such an explanation and in light of this contradictory evidence, the Court cannot conclude that Defendants' invocation of Exemption 7(A) for their *Glomar* responses was logical or plausible.[3]

Ultimately, Defendants have not sufficiently shouldered their burden in justifying that this is one of the "rare situation[s]" in which the invocation of *Glomar* is proper.  <u>Bartko</u>, 898 F.3d at 63–70 (explaining that *Glomar* responses are "permitted [only] in . . . rare situation[s]" supported by more than "a bare-bones declaration" and rejecting agency's invocation of same and Exemption 7(C) (citations omitted)); <u>see, e.g.</u>, <u>Am. C.L. Union v. CIA</u>, 710 F.3d at 426–32 (explaining that *Glomar* responses are appropriate only "in limited circumstances" and rejecting agency's justification for invoking *Glomar*); <u>Roth v. U.S. Dep't of Just.</u>, 642 F.3d 1161, 1172–84 (D.C. Cir. 2011) (explaining that "*Glomar* responses are an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information" and rejecting agency's justification for invoking *Glomar* and Exemption 7(C) (citation omitted)); <u>Am. C.L. Union v. Dep't of Def.</u>, 492 F. Supp. 3d at 260–68 (concluding that agency's invocation of *Glomar* was unjustified where a subsequent disclosure by the same agency "shift[ed] the factual groundwork on which the Court examines the propriety of the FOIA Exemptions" and made "the continued use of that exemption illogical and implausible" (alteration in original)); <u>Leopold v. U.S. Dep't of Just.</u>, No. 17-cv-2819 (APM), 2022 WL 4598596, at *8–9 (D.D.C. Sept. 30, 2022) (noting that "abbreviated

---

[3] As the Court determines that Defendants have not shouldered their burden as to the invocation of Exemption 7(A) for their *Glomar responses*, it does not reach the ACLUM's alternative argument that Trump's statements made after the end of his presidency satisfy the official acknowledgement doctrine and waive Defendants' right to invoke *Glomar*.  D. 27-1 at 17–20.

justifications do not plausibly or logically" justify agency's reliance on *Glomar* and Exemption 7(A) and explaining that "[e]ven with the substantial deference the court must afford an agency in the national security setting, [defendant] has not persuaded the court that its *Glomar* response in this case is plausible or logical" (internal quotation marks omitted)); Lindsey, 271 F. Supp. 3d at 6–9 (concluding agency's justification for invoking *Glomar* and Exemption 7(C) was insufficient).

## VI.    Conclusion

For the foregoing reasons, the Court DENIES Defendants' motion for summary judgment, D. 24, and ALLOWS the ACLUM's cross-motion for summary judgment on the limited issue of whether Defendants "improperly refused to confirm or deny the existence of records responsive to [the] ACLUM's [FOIA] requests," D. 27.  Defendants are hereby ORDERED to confirm or deny the existence of records responsive to the ACLUM's August 15, 2022 and August 16, 2022 FOIA requests by May 25, 2023.  The parties are further ordered to confer and submit a joint scheduling proposal to the Court for any further deadlines for disposition of this case.  Such proposal shall be filed with the Court by June 1, 2023.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge